**SIGNED this 1 day of September, 2016.**

**Austin E. Carter**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-52314-AEC |
| William Jackson Cochran, | ) | |
| | ) | Chapter 13 |
| Debtor. | ) | |

Before

Austin E. Carter
United States Bankruptcy Judge

Counsel:

| | |
|---|---|
| For Debtor: | Calvin L. Jackson<br>1259 Russell Parkway<br>Suite T<br>Warner Robins, GA 31088 |
| For RREF II PB-GA, LLC: | Stephen P. Drobny<br>Jones Walker LLP<br>One Midtown Plaza<br>1360 Peachtree, NE<br>Suite 1030<br>Atlanta, GA 30309 |
| For Trustee: | Laura Wilson<br>Office of the Chapter 13 Trustee<br>P.O. Box 954<br>Macon, GA 31202 |

# MEMORANDUM OPINION

The primary issue in this case is whether a plan that calls for distributions in the form of monthly payments followed by a balloon payment to a creditor holding a claim secured by the debtor's real property complies with § 1325(a)(5)(B)(iii)(I) of the Bankruptcy Code.[1]

## FACTUAL BACKGROUND

On August 28, 2009, the Debtor pledged his residence and the adjoining 157 acres of land as collateral on a loan from The Bank of Perry for the purchase of equipment for the Debtor's automotive collision repair business. The Debtor was unable to pay the balance of the loan when it matured in 2012. However, the Debtor continued to make regular payments until The Bank of Perry assigned the note and its security interest to RREF II PB-GA, LLC ("RREF") in 2015. RREF subsequently initiated foreclosure proceedings on the property. The Debtor filed a Chapter 13 petition on October 10, 2015 to avoid the foreclosure.

RREF timely filed a claim in the Debtor's bankruptcy case in the amount of $649,990.09, secured by the Debtor's residence and the adjoining acreage (no. 2 on the claim register). RREF's objection to confirmation concerns the Plan's treatment of this claim.[2] At the confirmation hearing, the parties agreed that the value of the real property exceeds the amount of RREF's claim.

The Plan proposes that, within the first twelve months after confirmation, the Debtor will make a balloon payment that will pay off the balance of RREF's secured claim. Until such balloon payment, the Debtor will make monthly payments of $2,500. These payments are a continuation of the adequate protection payments that the Debtor began making to RREF on account of its secured claim on December 7, 2015 under the Court's *Order Denying Motion for*

---

[1] Unless otherwise indicated, all references herein to "section" or "§" refer to a corresponding section of the Bankruptcy Code, and all references to the "Bankruptcy Code" relate to the corresponding sections of Title 11 of the U.S. Code.

[2] RREF also asserts a separate, unsecured claim in the amount of $286,000 (no. 6 on the claim register), which results from the Debtor's guaranty of a loan for his business, Cochran Coachworks, Inc. The Debtor's Plan provides that this unsecured claim will be paid by the Debtor's business.

*Relief from Automatic Stay and Granting Adequate Protection* (Dkt. 33).[3] (Such monthly $2,500 payments are hereinafter referred to as the "Adequate Protection Payments.") RREF filed an objection to the confirmation of the Debtor's Plan on two grounds: (1) § 1325(a)(5) is not satisfied because the proposed balloon payment is a periodic payment unequal to the preceding Adequate Protection Payments in contravention of § 1325(a)(5)(B)(iii)(I); and (2) § 1325(a)(6) is not satisfied because the balloon payment renders the Plan not feasible.[4]

At the confirmation hearing, the Debtor testified in support of the Plan. In order to acquire the funds necessary to satisfy RREF's secured claim, the Debtor intends to transfer his interest in the real property to his wife, who will obtain a loan in her name to refinance the property. To qualify for the loan, the wife, a little more than a month prior to the hearing, received a salary increase from the Debtor's business, Cochran Coachworks, Inc., where she is a long-term employee. According to the Debtor, his business can afford the increased salary to his wife. The Debtor testified, without objection, that a loan officer from Planters First Bank indicated that he sees "no problem" with a refinance of the property once the wife has a six-month historical record of receiving her increased salary. The Debtor can afford to pay RREF the Adequate Protection Payments until RREF's secured claim is satisfied by the planned refinance.

RREF obtained the Debtor's acknowledgment that the refinance is not certain to occur, and that he does not have a term sheet, commitment letter, or final loan approval. RREF did not otherwise challenge the Debtor's testimony as to the refinance proposal or offer any rebuttal evidence.

---

[3] This Order was entered earlier in this case, after the hearing on RREF's motion for relief from stay as to the subject real property. At that hearing, the Debtor offered monthly payments of $2,500 in adequate protection. This is the approximate amount of Debtor's monthly payment amount (both before and after the maturity of the loan) before it was assigned to RREF (at which time the payments were no longer accepted). RREF declined to argue that the subject real estate was depreciating faster than the amount of these payments. Accordingly, the Court found that these payments were sufficient to provide RREF with adequate protection as to its secured claim.

[4] RREF's written objection raised good faith under § 1325(a)(3) and -(a)(7). However, at the hearing, RREF clarified that its good faith objection was actually a feasibility objection under § 1325(a)(6).

The Debtor's Plan proposes to pay unsecured claims a 100% dividend. The Chapter 13 trustee reports that the Debtor has made all of his Plan payments. The trustee does not oppose confirmation of the Plan.

Pursuant to the Court's direction at the confirmation hearing, the parties filed post-hearing briefs in support of their respective arguments.

## LEGAL ANALYSIS

As noted above, RREF objects to the confirmation of the Plan on two grounds: (1) the Plan violates § 1325(a)(5)(B)(iii)(I) by providing for monthly payments to RREF followed by a balloon payment;[5] and (2) the Plan is not feasible as required under § 1325(a)(6).[6]

### I. Section 1325(a)(5)(B)(iii)(I) does not prohibit balloon payments.

RREF contends that the balloon payment is part of the stream of periodic Adequate Protection Payments proposed by the Plan. For this reason, in RREF's view, the balloon payment "is in the form of periodic payments" which must "be in equal monthly amounts" under § 1325(a)(5)(B)(iii)(I). Following this reasoning, because the balloon payment will not be equal to the previous monthly payments, it is statutorily prohibited.

---

[5] To satisfy § 1325(a)(5)(B)(ii) and (iii), "with respect to each allowed secured claim provided for by the plan" the plan must provide that:

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
>
> (iii) if—
>
> > (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
> >
> > (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan.

11 U.S.C. § 1325(a)(5)(B).

[6] Section 1325(a)(6) requires that the "debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6).

The Debtor disagrees with this conclusion, arguing that his proposed post-confirmation Adequate Protection Payments to RREF should not be considered "periodic payments" under § 1325(a)(5)(B)(iii)(I), and thus there is no stream of "periodic payments" with which the balloon payment must be equal.[7] Secondarily, the Debtor argues that the unique facts presented in this case invoke a balance of the equities in his favor.

1. The majority rule is that balloon payments are periodic payments proscribed by § 1325(a)(5)(B)(iii)(I).

RREF notes that an overwhelming majority of reported decisions on this issue take the position that § 1325(a)(5)(B)(iii)(I) proscribes confirmation of a plan with a balloon payment on a secured claim following a stream of periodic payments.[8] However, none of these decisions are controlling law in the Eleventh Circuit.

---

[7] Some courts seem to suggest that adequate protection payments, even though regularly occurring, may not qualify as "periodic payments" under § 1325(a)(5)(B)(iii)(I). In *Bollinger*, the court stated in a footnote:

> 11 U.S.C. § 1325(a)(5)(B)(iii)(I) does not, of course, prohibit a single payment in full at any time during the course of the plan, assuming all other elements of §§ 1325 and 1322 have been complied with. Where the collateral is real property adequate protection payments appropriate under § 361 maybe [sic] addressed in a plan or separately.

*In re Bollinger*, No. BR 10-62344, 2011 WL 3882275, at *4 n.12 (Bankr. D. Or. Sept. 2, 2011). While the *Bollinger* court did not specify its meaning behind this statement, the statement is located in the part of the opinion concluding that § 1325(a)(5)(B)(iii)(I) requires that all periodic payments to secured creditors be equal, to the necessary exclusion of balloon payments. *See id.* Thus, this statement could be read as a suggestion that the court would consider adequate protection payments, even on real property, something other than the "periodic payments." *See also In re Hernandez*, No. 14-12231, 2015 WL 5554126, at *3 n.6 (Bankr. S.D. Fla. Sept. 18, 2015) ("[N]othing in chapter 13 restricts or modifies the rights of holders of claims secured by real property to seek adequate protection . . . .").

Other courts have held that a debtor's labeling of plan payments as "adequate protection" payments does not remove them from the purview of § 1325(a)(5)(B)(iii)(I). *See In re Acosta*, No. 08-11411, 2009 WL 2849096, at *3 (Bankr. N.D. Cal. May 7, 2009) ("The debtors' plan calls for monthly interest-only payments for four or five years, with a balloon at the end. Their argument is that the interest payments are 'adequate protection payments' and not 'periodic payments.' The court declines their invitation to engage in this sophistry; payments are payments."); *In re Luckett*, No. 07-24706-SVK, 2007 WL 3125278, at *2 (Bankr. E.D. Wis. Oct. 24, 2007) ("Calling the property distributed on the claim 'adequate protection payments' does not change the fact that this is property distributed on the claim. If made over time, the distributions of the property on the claim must be in equal monthly amounts, and, unless [the creditor] consents, the balloon payment at the end of the Plan will not satisfy this requirement.").

The Court does not opine on this point because, as stated hereinafter, a balloon payment is not a "periodic payment," regardless of whether or not the balloon payment is preceded by periodic payments.

[8] In its Court filings, RREF cites to the following cases: *Flynn v. Bankowski* (*In re Flynn),* 402 B.R. 437 (B.A.P. 1st Cir. 2009) (per curiam); *Hamilton v. Wells Fargo Bank, N.A. (In re Hamilton),* 401 B.R. 539 (1st Cir. BAP 2009); *In re Soppick,* 516 B.R. 733 (Bankr. E.D. Pa. 2014); *In re Spark,* 509 B.R. 728 (Bankr. M.D. Fla. 2014); *In re Holifield*, No. 13-63536, 2014 WL 948828 (Bankr. D. Or. Mar. 12, 2014); *In re Kirk*, 465 B.R. 300 (Bankr. N.D.

While some of the cases cited by RREF are distinguishable,[9] others are not, and RREF is correct in noting that there is a substantial body of case law holding that balloon payments are unequal periodic payments proscribed by § 1325(a)(5)(B)(iii)(I). These decisions are based on three primary rationales: (1) statutory language—where the plan also provides for periodic payments, balloon payments are prohibited because they are, by definition, not equal to such preceding periodic payments; (2) congressional intent—Congress intended to eliminate balloon payments by enacting § 1325(a)(5)(B)(iii)(I); and (3) precedent—the majority of courts so hold. *See, e.g.*, *Hamilton v. Wells Fargo Bank, N.A. (In re Hamilton)*, 401 B.R. 539 (B.A.P. 1st Cir. 2009) (most prominent case setting forth this position). For the reasons that follow, the Court finds none of these arguments persuasive.

2. <u>The Court declines to follow the majority rule because it goes against the plain language and purpose of § 1325(a)(5)(B)(iii)(I)</u>.

A. *The plain language of § 1325(a)(5)(B)(iii)(I) allows for balloon payments.*

The arguments based on statutory language reason that balloon payments by definition are not equal to the preceding payments, and thus cannot be "in equal monthly amounts," so contravening § 1325(a)(5)(B)(iii)(I). This line of reasoning purports to rely on a dictionary definition of "periodic" as any payment that is repeated or regular. *See, e.g.*, *In re Hamilton*, 401 B.R. at 544. These courts assume that because a balloon payment occurs as part of, or following, a series of regular payments, it too must be "periodic." The Court disagrees with this conclusion.

---

Ala. 2012); *In re Carman*, No. 07-44271-JBR, 2008 WL 2909863 (Bankr. D. Mass. July 25, 2008); *Wells Fargo Fin. Ga. v. Baxter (In re Williams)*, 385 B.R. 468 (Bankr. S.D. Ga. 2008); *In re Wallace*, No. 07-10729, 2007 WL 3531551 (Bankr. M.D.N.C. Nov. 12, 2007); *In re Luckett*, 2007 WL 3125278; *In re Newberry*, No. 07-10170, 2007 WL 2029312 (Bankr. D. Vt. July 10, 2007); *In re Lemieux*, 347 B.R. 460 (Bankr. D. Mass. 2006); *In re Wagner*, 342 B.R. 766 (Bankr. E.D. Tenn. 2006); *In re DeSardi*, 340 B.R. 790 (Bankr. S.D. Tex. 2006).

[9] Many of the cases cited address the separate but related issue of whether § 1325(a)(5)(B)(iii)(I) and -(II) allow for the payment of attorney fees (and administrative expenses) prior to the trustee's commencing the distribution of § 1325(a)(5)(B)(iii)(I) periodic payments, so long as adequate protection payments under § 1325(a)(5)(B)(iii)(II) are continued in the interim as to any claims secured by personal property. *See, e.g.*, *In re Kirk*, 465 B.R. 300; *In re Williams*, 385 B.R. 468; *Royals v. Massey (In re Denton)*, 370 B.R. 441 (Bankr. S.D. Ga. 2007); *In re DeSardi*, 340 B.R. 790.

The Debtor, in his brief, cites *Independent Mortgage Co. v. Porter (In re Porter)*, 370 B.R. 891 (Bankr. M.D. Pa. 2007), which, though addressing balloon payments, is distinguishable because it was decided under a good faith analysis rather than § 1325(a)(5)(B)(iii)(I). *In re Holifield*, 2014 WL 948828, cited by RREF, is distinguishable on the same grounds as *Porter*.

A balloon payment satisfies the debt in full, and thus by definition cannot be repeated periodically, whether in equal amounts or otherwise.

Because "periodic" payments are regularly reoccurring and balloon payments are not, balloon payments are not "property to be distributed . . . in the form of periodic payments" and, consequently, are outside the scope of § 1325(a)(5)(B)(iii)(I). This conforms with the common and technical understanding of these terms. For example, *Webster's Third New International Dictionary* defines "periodic" as something that is "characterized by periods," occurs "at regular intervals," and occurs "repeatedly from time to time." *Periodic*, *Webster's Third New International Dictionary* (Philip Babcock Gove ed., 1971). *Black's Law Dictionary* defines a "periodic payment" as "[o]ne of a series of payments made over time instead of a one-time payment for the full amount." *Payment*, *Black's Law Dictionary* (10th ed. 2014). While it is obvious that the balloon payment cannot itself be reoccurring, one could argue that such payment is merely the last of the series of reoccurring payments. However, this is inconsistent with *Black's* use of these terms. *Black's* defines a "balloon payment" as "[a] final loan payment that is usually much larger than the preceding *regular payments* and that discharges the principal balance of the loan." *Id*. (emphasis added). In defining "balloon payment," *Black's* references the definition of "balloon note": "A note requiring small *periodic payments* but a very large *final payment*. *The periodic payments* usually cover only interest, while *the final payment (the balloon payment)* represents the entire principal." *See Note*, *id.* (emphasis added). These definitions establish that a final, balloon payment is distinct and separate from the preceding "periodic payments." Accordingly, it is only the periodic payments—and not the balloon payment—that are subject to the "equal monthly amounts" directive of § 1325(a)(5)(B)(iii)(I).

In reaching a contrary conclusion, courts seem to make one of two errors. First, some courts overlook the "if" in § 1325(a)(5)(B)(iii)(I), assuming that all secured claims must be paid by periodic payments;[10] however, this interpretation renders the "if" superfluous, and goes

10 *See In re Wagner*, 342 B.R. at 772 ("[U]nder the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), payments to secured creditors must be in equal amounts."); *see also In re Lemieux*, 347 B.R. at 464 (following *Wagner*).

against legislative history and the more careful analysis rendered by other courts. *See, e.g.*, *United States v. McClure (In re McClure)*, No. 10-cv-00141 (M.D. Ga. Sept. 30, 2011), ECF 10 (recognizing that "payments to secured creditors are only required in equal monthly amounts '*if* property to be distributed . . . is in the form of periodic payments.'"). Second, many courts, such as *Hamilton* and its progeny, seem to have avoided the first error only to fall into another—the failure to recognize that the "property to be distributed under the plan on account of such claim" under § 1325(a)(5)(B)(ii) and -(iii) does not have to be of a singular type and need not be made in a singular manner. In other words, these courts appear to assume that a plan is limited to proposing to satisfy a particular claim with only type of property or payment. This assumption is not supported by the language of the statute, the better reasoned case law, or the legislative history of § 1325(a)(5).

The language of § 1325(a)(5)(B) indicates that the property distributed on account of a claim need not be of a singular type and need not be made in a singular manner. Importantly, § 1325(a)(5)(B)(iii) does not include a definite article, such as "the." For example, the related, immediately preceding provision—§ 1325(a)(5)(B)(ii)—refers to "*the* value, as of the effective date of the plan, of property," indicating that there is only one value, but allowing for numerous articles "of property." Section 1325(a)(5)(B)(iii) does not state "if *the* property to be distributed pursuant to this subsection;" rather, it states "if property." Cases to consider this question in the context of § 1325(a)(5)(B)(ii) have reached similar conclusions. *See, e.g.*, *City Bank & Trust Co. v. Glenn (In re Glenn)*, 1999 WL 68570, at *2 (6th Cir. Jan. 20, 1999) (per curiam) (unpublished) ("We conclude that in speaking of 'property to be distributed under the plan' the code embraces any property for which distribution arrangements are made in the plan."); *In re Stockwell*, 33 B.R. 303, 305 (Bankr. D. Or. 1983) ("[Section 1325(a)(5)(B)] speaks of property to be distributed under the plan. The term 'property,' as used in subsection (B), is sufficiently broad to include cash or any other type of property.").[11] The legislative history of the original

[11] *See also* 8 *Collier on Bankruptcy* ¶ 1325.06[3][b][ii] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) ("'Property' [as used in § 1325(a)(5)(B)(ii)] is not a defined term, but it is altogether unrestricted in scope and

statutes indicates that Congress intended for debtors to have flexibility as to the property that is distributed on account of a secured creditor's claim. *See* H.R. Rep. No. 95-595, at 549 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6482 ("A secured creditor in a case under Chapter 13 is treated identically with a recourse creditor under section 1111(b)(1) of the House Amendment except that the secured creditor in a case under Chapter 13 may receive *any property* of a value as of the effective date of the plan equal to the allowed amount of the creditor's secured claim rather than being unrestricted [sic] to receiving deferred cash payments." (emphasis added)).

Several commentators have recognized the Court's construction of § 1325(a)(5)(B)(iii). For instance, in their leading treatise on Chapter 13, Judge Drake, Judge Bonapfel, and Chapter 13 Trustee Adam Goodman observed:

> The term "periodic payments" could be construed to mean regular, recurring payments that are made to reduce a secured claim during the plan's term but not to a final one that completely satisfies it. A regular installment payment or payment of interest on the debt is a "periodic" one, whereas a lump sum payment is not. So long as the interim payments provide adequate protection, if required by Code § 1325(a)(5)(B)(iii)(II), this interpretation of "periodic payments" accomplishes the primary objective of the new provisions of Code § 1325(a)(5)(B)(iii) that a secured creditor receive regular payments to reduce its debt and protect it from loss of value in its collateral through depreciation.

Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel, & Adam M. Goodman, *Chapter 13 Practice & Procedure* § 5:18 (2016). In addition, Professor Lynn LoPucki recently noted:

> [The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23] added the following requirement to subsection 1325(a)(5)(B) of the Bankruptcy Code: "[I]f . . . property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts." Read literally, this provision does not prohibit balloon payment plans. The provision applies only to plan payments "in the form of periodic payments." Had the drafters intended it to prohibit both balloon payments and periodic

unquestionably encompasses any and all kinds of property of the estate and property of the debtor 'to be distributed under the plan.'").

> payments, the drafters would have said "all plan payments" instead of "such payments."
>
> "Periodic payments" are payments that occur "repeatedly or regularly." Balloon payments do not fit that definition. . . . .
>
> The payments that precede balloon payments are repeated and regular, but balloon payments are not. By definition, a balloon payment is always a last payment. Debtors make balloon payments by selling or refinancing. As a result, debtors do not make balloon payments on any schedule that can fairly be described as "periodic." Debtors make balloon payments when the sales or loans close—irrespective of when they make their periodic payments.
>
> Before and after the enactment of subsection 1325(a)(5)(B)(iii) of the Bankruptcy Code, debtors used formulae to specify the timing and amounts of periodic plan payments. For example, a formula might call for equal monthly payments over the plan period or 100 dollars a month over the first year and then equal semi-annual payments over the plan period's remainder. The language of subsection 1325(a)(5)(B)(iii) indicates an intention to standardize these formulae.
>
> The effort to standardize these formulae has nothing to do with balloon payments because the formulae do not apply to balloon payments. Balloon payments are one-time payments. The amount of a balloon payment is always the entire amount owing.
>
> . . . .
>
> Even assuming that [*Erwin*] correctly describes the problem that Congress sought to address, it does not follow that Congress intended to ban balloon payments. The language Congress used indicates a more limited purpose: to standardize the formulae for specifying periodic payments, without banning balloon payments. Congress may have thought that such standardization would make it easier for courts to assess and control the backloading problem, while at the same time continuing to allow balloon payments as a safety valve.

Lynn M. LoPucki, *House Swaps: A Strategic Bankruptcy Solution to the Foreclosure Crisis*, 112 Mich. L. Rev. 689, 729-33 (2014).

Pursuant to the foregoing analysis, the Court concludes that balloon payments are not within the ambit of the "periodic payments" under the plain language of § 1325(a)(5)(B)(iii)(I), and, as such, need not be equal to preceding payments. Such plain statutory language is conclusive unless the result is absurd or demonstrably at odds with Congress's intent. *Cf. United*

*States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'").

B. *Allowing balloon payments in a Chapter 13 plan is consistent with congressional intent.*

Here, the literal application of the statute is not absurd, and it will not produce a result demonstrably at odds with the intentions of Congress. Upon the Court's review, cases prohibiting balloon payments as contrary to the history or purpose of § 1325(a)(5)(B)(iii)(I) do so based on unsupported judicial speculation, rather than formal legislative history. For example, the cases cited by RREF raising congressional intent arguments all rely on *In re Erwin*, 376 B.R. 897, 901 (Bankr. C.D. Ill. 2007), *In re Acosta*, No. 08-11411, 2009 WL 2849096, at *3 (Bankr. N.D. Cal. May 7, 2009), *In re DeSardi*, 340 B.R. 790, 809-10 (Bankr. S.D. Tex. 2006), or cases that in turn rely on these cases.[12] A careful examination of these cases, however, reveals that these courts' conclusions as to congressional intent are unsupported by citations to formal legislative history, but rather appear to be the result of mere educated speculation.

The relevant language in *Erwin* is as follows:

> Prior to BAPCPA, it was not uncommon for some Chapter 13 plans to provide for backloaded payments, such as balloon payments. Another form of backloading involved graduated or step-up payment plans, where the payments started out smaller and increased over time. Secured creditors, particularly those secured by a vehicle, viewed this as unfair, exposing them to undue risk in light of the constant depreciation of their collateral.
>
> Other plans, filed by debtors whose employment is seasonal, provided for reduced payments or no payments at all during certain months of the year, or called for payments to be made quarterly or semi-annually, rather than monthly, based upon the peculiarities of

[12] For example, *Hamilton*, *Soppick*, *Bollinger*, *Sanchez*, and *Luckett* all trace back to *Erwin* and/or *Acosta*. *In re Hamilton*, 401 B.R. at 543 (citing *Luckett*); *In re Soppick*, 516 B.R. at 753-54 (citing *Bollinger*); *In re Bollinger*, 2011 WL 3882275, at *2-3 (citing *Erwin* and *Acosta*); *In re Sanchez*, 384 B.R. 574, 576-77 (Bankr. D. Or. 2008) (citing *Erwin*); *In re Luckett*, 2007 WL 3125278 at *2 (citing Erwin).

*Spark* and *Hill* trace back to *DeSardi*. *In re Spark*, 509 B.R. at 730 (citing *Hill*); *In re Hill*, 397 B.R. 259, 270 (Bankr. M.D.N.C. 2007) (citing *DeSardi*).

> the debtor's income stream. Secured creditors had similar complaints with those plans.
>
> In response to those creditor concerns, Congress enacted the equal payment provision and a companion provision extending the concept of adequate protection, formerly a preconfirmation requirement, to postconfirmation plan payments. 11 U.S.C. § 1325(a)(5)(B)(iii)(II). The equal payment provision prevents debtors from backloading payments to secured creditors or paying them other than on a monthly basis. It is easy to understand why the courts in *Schultz*, *Lemieux*, and *Wagner* had little difficulty denying confirmation of plans that called for balloon payments to secured creditors—a plan proposal clearly intended to be eliminated by the equal payment provision.

*In re Erwin*, 376 B.R. at 901.

The court in *Acosta* states in relevant part:

> Before 2005, the court over the years confirmed hundreds, or maybe even thousands, of balloon payment Chapter 13 plans. The court doubts that even a dozen of these cases was actually performed. Debtors retained the absolute right to dismiss, and always exercised the right when a creditor or the Chapter 13 trustee demanded performance. In some cases, the debtors did refinance outside Chapter 13 so that at least the secured creditor was paid. In many cases, the promise to sell or refinance was conveniently forgotten. In the worst cases, tolerated in far too many jurisdictions, the debtors merely filed new Chapter 13 cases and asked for another four or five illusory years. This abuse was undoubtedly one of the reasons Congress enacted § 1325(a)(5)(B)(iii)(I).

*In re Acosta*, 2009 WL 2849096, at *3 (internal citations omitted).

The language at issue in *DeSardi* is as follows:

> Two practices existed before BAPCPA that were viewed, by many, as abusive. First, chapter 13 plans were being confirmed by bankruptcy courts that deprived car lenders of any payments for a number of months. Prior to its amendment, § 1325(a)(5) did not explicitly require adequate protection payments—a chapter 13 plan could "provide payment to secured claim holders in an amount not sufficient to keep pace with depreciation of the underlying collateral." Hon. Keith Lundin and Henry Hildebrand, III, *Section by Section Analysis of Chapter 13 After BAPCPA*, SLO68 ALI–ABA 65, 94 (2005). Or a plan could provide no payment at all for a period of time. Forcing "creditors with a security interest ... to await payment on their secured claims ... often resulted in uncompensated depreciation of collateral during the pendancy of a

> chapter 13 case. In the worst-case scenario, a creditor could wait as long as twenty-four months before receiving any distributions on an allowed secured claim." Richardo Kilpatrick, *Selected Creditor Issues Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 Amer. Bankr. L.J. 817, 836 (2005).

*In re DeSardi*, 340 B.R. at 809-10.

*Erwin* and *Acosta*'s statements are not supported by citation to *any* authority. *Cf. In re Bollinger*, No. BR 10-62344-FRA13, 2011 WL 3882275, at *3 (Bankr. D. Or. Sept. 2, 2011) (recognizing *Erwin*'s statements are entirely unsupported). This lack of cited authority is not surprising, as the only formal legislative history found by this Court with respect to § 1325(a)(5)(B)(iii)(I) merely echoes the wording of the subsection, without any insight as the purpose of its enactment. *See id.* ("There is scant, if any, formal legislative history revealing Congress' purposes."); *see also In re Soppick*, 516 B.R. 733, 753 (Bankr. E.D. Pa. 2014) (same). *See generally* H.R. Rep. 109-31(I), at 73 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 141 ("Section 309(c)(1) amends Bankruptcy Code section 1325(a)(5)(B) to require that periodic payments pursuant to a Chapter 13 plan with respect to a secured claim be made in equal monthly installments. Where the claim is secured by personal property, the amount of such payments shall not be less than the amount sufficient to provide adequate protection to the holder of such claim.").

While *DeSardi* cites to two secondary sources—Hon. Keith Lundin and Henry Hildebrand, III, *Section by Section Analysis of Chapter 13 After BAPCPA*, SLO68 ALI–ABA 65, 94 (2005) and Richardo I. Kilpatrick, *Selected Creditor Issues Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 Am. Bankr. L.J. 817, 835-36 (2005)—neither of these sources is supported by any primary source. More importantly, neither of these articles supports the proposition that Congress intended to eliminate balloon payments. Rather, these sources indicate that Congress sought to address depreciation of collateral (primarily

personal property) in relation to plans that allow for material delay and uncertainty in the commencement and continuation of payments.[13]

[13] Lundin and Hildebrand's article raises questions similar to those raised by the Court herein, but does not express an opinion negative to balloon payments.

> New § 1325(a)(5)(B)(ii) states that if property distributed "pursuant to this subsection" is in the form of "periodic payments," then such payments "shall be in equal monthly amounts." If "this subsection" means § 1325(a)(5), then this new equal monthly payment requirement would apply to every "allowed secured claim provided for by the plan" with respect to which periodic payments are provided by the plan. What does it mean to require "equal monthly amounts?" Does this mean that over the life of the plan the amount paid each month must be the same amount? Surely, it doesn't mean that all allowed secured claim holders are to receive the same amount each month? Put another way, is § 1325(a)(5)(B)(ii) measured claim by claim or collectively with respect to property distributed to all allowed secured claims? The House Report recites that § 1325(a)(5)(B) was amended "to require that periodic payments pursuant to a chapter 13 plan with respect to a secured claim be made in equal monthly installments." H.R. No. 109-31 at 85.
>
> How many payments are required and on what schedule for payments to be "periodic?" Is a payment once a year from the sale of a crop "periodic?" If the underlying debt does not call for monthly payments, does this new section mandate (equal) monthly payments? What about curing default and maintaining payments under § 1322(b)(5)? Does new § 1325(a)(5)(B)(iii)(I) require that the arrearage claim be spread out over the same number of months as the regular installments so that all payments will be equal? What do you do with a debtor whose income is not equal across the months of the year—a teacher, for example? Is it now prohibited to have larger monthly payments during months in which the debtor has more income?

Hon. Keith Lundin and Henry Hildebrand, III, *Section by Section Analysis of Chapter 13 after BAPCPA*, SL068 ALI-ABA 65, 93-94.

The journal article written by Kilpatrick similarly does not classify balloon payments as being "periodic payments," does not opine that Congress had a purpose to eliminate balloon payments on secured claims, and does not provide any citation to any authority that indicates that Congress had an intent to eliminate balloon payments.

> In many instances, creditors with a security interest have been required to await payment on their secured claims until after payment of administrative expenses which include unpaid attorneys' fees. Further, Chapter 13 plans often provided for payment of the current mortgage, payment of the mortgage arrearages, and payments made pursuant to a lease and lease arrearages prior to payments on secured claims. This often resulted in uncompensated depreciation of collateral during the pendency of a Chapter 13 case. In the worst-case scenario, a creditor could wait as long as twenty-four months before receiving any distributions on an allowed secured claim. Creditors attempted to address this issue by arguing that adequate protection should apply both pre and postconfirmation in a Chapter 13 case. This argument was not well received as adequate protection in most instances is afforded to a creditor preconfirmation to ensure that its collateral position is not diminished pending confirmation of a Chapter 11 or Chapter 13 case. To resolve this issue, § 1325(a)(5)(B) has been amended to provide that adequate protection applies both pre- and postconfirmation in Chapter 13 cases. Periodic payments are required in equal

Even assuming these statements are indicative of Congress's potential reasons for including § 1325(a)(5)(B)(iii)(I), weighing these statements and statements by other courts,[14] it seems that Congress intended to give creditors more certainty and regularity as to any proposed a stream of payments. Requiring any stream of payments to be equal falls within the periodic payments language and functions in tandem with Congress's concerns over protecting holders of claims secured by personal property (as evident from § 1325(a)(5)(B)(iii)(II)). Accordingly, the Court determines that Congress had reasons other than prohibiting balloon payments in enacting the equal payment provision—reasons that fit more naturally with the language of the statute, and that are not implicated by the Debtor's Plan.

Indeed, the majority rule, by making such broad assumptions of congressional intent, has turned a basic canon of construction on its head. "When Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) (citation omitted). Accordingly, the Court will "not read the Bankruptcy Code to erode [pre-BAPCPA] bankruptcy practice absent a clear indication that Congress intended such a departure." *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (citations omitted); *see also Dewsnup*, 502 U.S. at 419 (stating that the Supreme Court is "reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"). As recognized in the cases cited by RREF, and every other case known to the Court as addressing the question, confirmation of feasible Chapter 13 plans providing for a series of

> monthly installments and must be sufficient to provide adequate protection to secured creditors during the term of the plan. BAPCPA also requires that payments to creditors commence as soon as practicable after confirmation.

Richardo I. Kilpatrick, *Selected Creditor Issues under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 Am. Bankr. L.J. 817, 835-36 (2005) (footnotes omitted).

14 There are good arguments that § 1325(a)(5)(B)(iii)(I) should be read in connection with § 1325(a)(5)(B)(iii)(II) to address "pre-BAPCPA practices that harmed secured creditors with depreciating collateral." *DaimlerChrysler Fin. Servs. Americas, LLC v. Rivera (In re Rivera)*, No. 1:08-CV-21-TS, 2008 WL 1957896, at *3 (N.D. Ind. May 2, 2008) (citation omitted); *see also In re Hernandez*, 2015 WL 5554126, at *3 n.6 ("Apparently section 1325(a)(5)(B)(iii) and section 1326 were passed to address perceived abuses of car lessors and purchase money secured creditors." (citing BAPCPA)). A balloon payment on a claim secured by non-depreciating real property does not implicate this concern.

payments on a secured claim followed by and culminating with a balloon payment was a regular feature of pre-BAPCPA practice. Neither the statutory language nor the legislative history indicates that Congress intended to depart from this prior practice by enacting § 1325(a)(5)(B)(iii)(I). While BAPCPA certainly included many aspects of creditor-friendly reform, it is bad statutory interpretation to presume, to the detriment of prior established practice, a more creditor-friendly result than is warranted by the statute's language and history.

Moreover, the majority rule runs against the grain of Chapter 13's underlying purposes. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990) (citations omitted). The interpretation argued by the creditor would go against Congress's intent to provide a flexible means for the debtor to protect his assets, most importantly those assets necessary to pay his creditors by completing his plan, such as a house to live in or car to drive to work.[15] This flexibility is evident in the structure of Chapter 13 itself. *See, e.g.*, 11 U.S.C. § 1322(b)(8) ("[T]he plan may . . . provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor."), -(b)(9) ("[T]he plan may . . . provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity."); *see also* Drake, Bonapfel, Goodman, *Chapter 13 Practice & Procedure* § 5:19 (2016) ("A provision that effects a partial relinquishment of encumbered property as a transfer, instead of as a surrender, requires only the invocation of subparagraph (B) of Code § 1325(a)(5). Code § 1322(b)(8) permits a plan to provide for payment of all or any part of a claim from property of the estate or from property of the debtor. This provision thus authorizes payment of part of the secured claim through a transfer to the creditor of part of the encumbered property and payment of the remaining claim, secured by the

---

15 *See generally In re Ramos*, 357 B.R. 669, 672 (Bankr. S.D. Fla. 2006) ("[M]ost courts have held that in a Chapter 13 case, a debtor's home is necessary for an effective reorganization . . . ." (citing cases)).

retained property, in deferred cash payments.”). This flexibility is further reflected in the legislative history.[16]

The importance of this flexibility is highlighted here. RREF holds an oversecured claim and will be receiving Adequate Protection Payments until it is either paid in full or is granted stay relief as to the real property. There has been no suggestion that the real property is depreciating. Accordingly, RREF suffers little, if any, risk of harm. On the other hand, the Debtor is facing the loss of a home and a substantial amount of land even though he has proposed a feasible plan to pay off the secured creditor within a relatively short period.

C. *Other courts have allowed balloon payments in a Chapter 13 plan after the passage of BAPCPA.*

The Court is not alone in confirming a post-BAPCPA Chapter 13 plan calling for a balloon payment to a secured creditor, so long as the plan is found to be feasible. *See In re Ramirez*, No. 13-20891-AJC, 2014 WL 1466212, at *4 (Bankr. S.D. Fla. Apr. 7, 2014) (“Permitting the Debtor to structure his plan with affordable payments for the next five years and the opportunity to refinance in month 60 using the equity in his home is ‘consistent with the Congressional intent to provide Chapter 13 debtors with flexibility in structuring their plans . . . [t]he policy behind Chapter 13 is to encourage individuals to pay their debts as opposed to simply obtaining a discharge under Chapter 7. We recognize this statutory goal and seek to preserve it.’” (citations omitted));[17] *see also, e.g., In re Meredith*, No. 11-30227, (Bankr. D. Or.

---

[16] The following quote from the legislative history to Chapter 13 (when it was first enacted) demonstrates this purpose:

> Chapter 13 of proposed Title 11, though derived in basic concept from Chapter XIII of the present bankruptcy act, is new in many of its essential features. It gives the debtor more flexibility in the formulation of a plan; it . . . . enables him to support himself and his dependents while repaying his creditors at the same time. The benefit to the debtor of developing a plan of repayment under Chapter 13, rather than opting for liquidation under Chapter 7, is that it permits the debtor to protect his assets. . . . Under Chapter 13, the debtor may retain his property by agreeing to repay his creditors.

H.R. Rep. No. 95-595, at 118 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6079.

[17] Although the court in *Ramirez* confirmed the debtor’s balloon payment plan over a secured creditor’s objection, it is unclear whether the creditor objected on the grounds of § 1325(a)(5)(B)(iii)(I).

May 19, 2011), ECF 31 (confirming balloon payment plan over creditor's § 1325(a)(5)(B)(iii)(I) objection); *In re Davis*, No. 10-39945 (Bankr. D. Or. May 5, 2011), ECF 57 (same).

For these reasons, the Court respectfully declines to follow the majority rule and holds that balloon payments are not "periodic payments" proscribed by § 1325(a)(5)(B)(iii)(I).

**2. The Debtor has met his burden to show that the Plan is feasible.**

When addressing the feasibility of a plan proposing a balloon payment,

> Courts consider numerous factors, including the future earning capacity and disposable income of the debtor, whether the plan provides for the payment of interest to the secured creditor over the life of the plan, and "whether the plan provides for substantial payments to the secured creditor which will significantly reduce the debt and enhance the prospects for refinancing at the end of the plan."

*In re Ramirez*, 2014 WL 1466212, at *3 (citing *First Nat'l Bank of Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423–24 (B.A.P. 1st Cir. 1997)).

RREF acknowledges that it is oversecured. Further, it will be receiving $2,500 each month in "adequate protection" payments under the Plan. In addition, although not expressly included in the Plan, the Debtor's attorney at the hearing (and thereafter in his brief) informed the Court that the Debtor would agree to the Court's including, in the order confirming the Plan, a provision for self-executing stay relief for RREF if the RREF claim is not paid off within the twelve-month period prescribed in the Plan. The Court adopts this modification, and takes it into its consideration of feasibility. Because these factors substantially reduce the risk to RREF, they reduce the showing required for feasibility of the Debtor's plan. *Cf., e.g., In re Showtime Farms, Inc.*, 267 B.R. 541 (Bankr. E.D. Tex. 2000) (overruling feasibility objection, in part, because secured creditor was oversecured); *In re SM 104 Ltd.*, 160 B.R. 202, 239 (Bankr. S.D. Fla. 1993) (finding balloon payment feasible largely due to equity in property).

Although the Debtor did not offer a term sheet or commitment letter from a lender willing to refinance the property, the Debtor did testify that a loan officer at Planters First Bank had assured him and his wife that there would be no problem as to the refinance once his wife

has six months of work history at her new salary. There is no dispute that the Debtor's wife is willing to participate in the refinancing. The Debtor testified that Cochran Coachworks, Inc., which he owns, will be able to pay the Debtor's wife's increased salary. Such salary was paid to the Debtor's wife during the month preceding the confirmation hearing. RREF did not challenge the Debtor's ability to make his monthly Plan payments or undermine the Debtor's testimony as to his representations as to the likelihood of refinancing with Planters First Bank.

    For all these reasons, the Court finds that the Debtor's Plan is feasible and overrules RREF's objection to confirmation of the Debtor's Plan.

    The trustee is directed to upload a proposed order confirming the Debtor's Plan, consistent with the trustee's report in this case and with the addition of the self-executing stay relief to RREF described above.

[END OF DOCUMENT]